UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVORIN SKENDER and JOELLE SKENDER, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| vs. | ) | No. 1:22-cv-02054-JMS-KMB |
| | ) | |
| STATE FARM FIRE & CASUALTY COMPANY, | ) | |
| | ) | |
| *Defendant*. | ) | |

**ORDER**

Plaintiffs Davorin and Joelle Skender ("the Skenders") suffered an uninhabitable fire loss at their home in Bloomington, Indiana, and filed a claim under their Homeowner's Policy ("the Policy") issued by Defendant State Farm Fire & Casualty Company ("State Farm"). The Skenders found Belfor Construction ("Belfor"), a construction company who was willing to rebuild the home, but State Farm repeatedly rejected Belfor's estimates and insisted that the work could be done for less without identifying another construction company who was willing to do the work commensurate with State Farm's estimate. The Skenders eventually signed a contract with Belfor eight months after the fire for more than State Farm's estimate because they worried about being past the two-year deadline on the Policy if construction did not start soon. Construction on the home finished, and State Farm only paid the amount of its estimate, not the full replacement cost of rebuilding the home. The Skenders subsequently brought this lawsuit against State Farm asserting claims for breach of contract and breach of the duty of good faith and fair dealing. [Filing No. 1-2 at 9-10.] State Farm has filed a Motion for Partial Summary Judgment on the breach of the duty of good faith and fair dealing claim. [Filing No. 38.] State Farm has also objected to certain deposition testimony that the Skenders rely upon in their Response in Opposition to

Defendant's Motion for Partial Summary Judgment, [Filing No. 53 at 2-7], and the Skenders have objected to three exhibits that State Farm relied upon in its Reply Brief in Support of its Motion for Partial Summary Judgment, [Filing No. 54 at 7-8].  The Motion is ripe for the Court's review.

# I.
## EVIDENTIARY ISSUES

Both the Skenders and State Farm object to the admissibility of certain evidence presented by the other within their summary judgment briefs.  Because the Court's rulings on the objections impact the evidence the Court can consider on summary judgment, the Court turns first to the objections.

### A.  Ken Jones' Deposition Testimony

In its Reply Brief in Support of its Motion for Partial Summary Judgment, State Farm argues that the Skenders' use of a State Farm employee's deposition testimony from another lawsuit in their Response in Opposition, [Filing No. 44 at 12-14], is inadmissible under Federal Rule of Civil Procedure 32.  [Filing No. 53 at 5.]  The Skenders use the deposition testimony of Ken Jones, who was the Fire Proximity Team Manager at State Farm when State Farm received the Skenders' claim and who was involved in adjusting the Skenders' claim, to establish that State Farm employees receive training on the duty of good faith and its requirements.  [Filing No. 43-4 at 4-5; *see* Filing No. 43-4 at 24-43; Filing No. 44 at 12-14.]  State Farm argues that the use of this testimony does not meet Federal Rule of Civil Procedure 32.  [Filing No. 53 at 5.]

In response, the Skenders argue that Rule 32 is not applicable to this issue, but rather that "the actual question before the Court is whether the deposition testimony is competent evidence under [Federal Rule of Civil Procedure 56] and whether it has been made part of the record." [Filing No. 54 at 1 (citation omitted).]  They also argue that, in any event, Mr. Jones' testimony is

admissible under Federal Rule of Civil Procedure 32 "as it has been interpreted and applied in many cases."  [Filing No. 54 at 2.]

The Skenders are correct that Rule 56, not Rule 32, answers the question of whether Mr. Jones' deposition testimony is admissible on summary judgment.  *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014) (explaining that "depositions from one case may be used at the summary judgment stage of another, even if Rule 32(a)(8)'s requirements are not met" because Rule 56 governs).  In order to use a deposition from another case at summary judgment, "the deposition must [first] satisfy Rule 56's requirements for an affidavit or declaration—i.e., the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters."  *Id.* (citing Fed. R. Civ. P. 56(c)(4)).  "Second, the deposition[] from the other case must be part of 'the record' in the present case, because Rule 56 states that a party must cite to 'materials *in the record*.'"  *Id.* (quoting Fed. R. Civ. P. 56(c)(1)(A)) (emphasis in original).

Here, both requirements are met.  First, Mr. Jones' deposition testimony was based on his personal knowledge of his State Farm employment and training, which he is competent to testify to, and the statements are admissible at trial under Federal Rule of Evidence 801(d)(2)(D) (statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of the relationship and while it existed").  Second, the Skenders filed Mr. Jones' deposition testimony as part of the record in this case.  [*See* Filing No. 43-4.]  Therefore, the Court can and does consider Mr. Jones' deposition.[1]  State Farm's objection is **OVERRULED**.

---

[1] In any event, the Court notes that the deposition testimony is also admissible under Rule 32(a)(8) because the Rule provides that "[a] deposition previously taken may also be used as allowed by the Federal Rules of Evidence."  And as already explained, the deposition testimony is admissible under Federal Rule of Evidence 801(d)(2)(D).

**B. The Skenders' Medical and Emotional Damages and State Farm's New Exhibits in Response**

In their Response in Opposition to Defendant's Motion for Summary Judgment, the Skenders note that they "suffered extreme stress related to the delays in approving estimates and completing the rebuild of their home, resulting in the need for mental health counseling for all family members and a diagnosis of atrial fibrillation for Mr. Skender." [Filing No. 44 at 31.] They argue that even though the State Farm adjusters knew and understood the duty of good faith, they "intentionally chose another path," which caused additional harm to the Skenders. [Filing No. 44 at 31.]

In its Reply Brief in Support of its Motion for Partial Summary Judgment, State Farm argues that all of the Skenders' "conclusions related to the medical, mental, and emotional damages" are inadmissible. [Filing No. 53 at 3.] State Farm introduced three new exhibits into the record relating to the Skenders' health during the claim period, [Filing No. 53 at 3; Filing No. 53-1; Filing No. 53-2; Filing No. 53-3], arguing that the Skenders' claims of physical and emotional damages are not supported by the facts or expert witnesses and the Court must disregard all references to such damages, [Filing No. 53 at 3-5].

In their Surreply, the Skenders' argue that State Farm's objection is misplaced because "[t]he law is clear that Plaintiffs can speak for themselves" regarding "how State Farm's treatment of them made them feel" and that "[e]xpert testimony is unnecessary when the cause of injuries falls within laypeople's common experiences or observations." [Filing No. 54 at 6 (citation omitted).] They also argue that the Court should disregard the new exhibits State Farm used in their Reply Brief in Support of Its Motion for Partial Summary Judgment. [Filing No. 54 at 7-8.]

The Court can make quick work of this dispute because the issue of damages is not before the Court. The sole issue before the Court is whether there are genuinely disputed facts that would

4

support an inference of bad faith on the part of State Farm.  Thus, the Court need not and does not consider the Skenders' testimony regarding their physical and emotional damages nor the three exhibits regarding the same that State Farm relied upon.  The parties' objections are therefore **OVERRULED AS MOOT**.

### C.  Mr. Skenders' Testimony Regarding Pricing and Repair Difficulty

State Farm also objects to the Skenders' use of Mr. Skender's Affidavit that he submitted in connection with his Response in Opposition to Defendant's Motion for Partial Summary Judgment, arguing that Mr. Skenders' statements regarding appropriate pricing and the difficulty of the repairs should be struck from the record because he is not a construction expert or qualified to opine on which pricing method was appropriate.  [Filing No. 53 at 2-3.]   The Skenders do not respond to this argument, [*see* Filing No. 54], which results in waiver.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Therefore, State Farm's objection is **SUSTAINED**, and the Court does not consider Mr. Skenders' opinion that restoration pricing was appropriate and his conclusion regarding the difficulty of repairs.

### II.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of*

*Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A. The Policy**

The Skenders purchased the Policy from State Farm. [Filing No. 43-5.] According to a version of the Policy that State Farm made a part of the record, the property coverages and limits under the Policy are as follows:

| Coverage | Limit of Liability |
|---|---|
| A Dwelling | $320,400 |
| Other Structures | $32,040 |
| B Personal Property | $240,300 |
| C Loss of Use | $96,120 |
| Debris Removal | Additional 5% available/$ 1,000 tree debris |
| Trees, Shrubs, and Landscaping | 5% of Coverage A amount/$ 750 per item |

[Filing No. 38-1 at 3.]   But according to a State Farm letter sent two days after the fire by Brad Szczerbik, the State Farm adjuster assigned to the Skenders' claim, the property coverages and limits under the Policy are actually higher:

| Coverage | Limit of Liability |
|---|---|
| A Dwelling | $342,508 |
| A Dwelling Extension Limit | $34,251 |
| B Personal Property | $256,881.00 |
| C Loss of Use | $102,752.00 |

[Filing No. 43-5 at 1-3.]   In the letter, Mr. Szczerbik also instructed the Skenders that, "[i]n addition to the coverage[]s outlined above, the following coverage[]s may apply to your claim and are subject to the provisions of your policy."   [Filing No. 43-5 at 1-3.]

| Coverage | Limit of Liability |
|---|---|
| Option ID-Increased Dwelling Limit | $68,501.60 |
| Option OL-Building Ordinance or Law | $34,250.80 |
| Debris Removal | $17,125.40 |
| Trees, Shrubs and Other Plants | $17, 125.40 |

[Filing No. 43-5 at 1-3.]

Despite the inconsistency between the Policy's numbers and Mr. Szczerbik's numbers in his letter, internal State Farm file notes from February 12, 2021 indicate that State Farm understood the Coverage A Dwelling Limit of Liability to be $342,508 and the Optional ID-Increased Dwelling Limit to be $68,501.60—consistent with the amounts in Mr. Szczerbik's letter.   [Filing No. 43-2 at 8.]

## B.  New Construction Versus Restoration Pricing

In the construction/labor industry, jobs can be categorized into one of two groups: new construction or restoration.  [Filing No. 38-3 at 7.]  The category chosen affects the price estimate. [*See* Filing No. 38-3 at 7.]  According to a white paper by Xactimate, a software that both State Farm and Belfor use, new construction pricing "provides a cost for each line item based on the most efficient labor productivity available" and "should be used for true new construction applications or for jobs in which a total 'ground-up' rebuild is necessary."  [Filing No. 38-3 at 3; Filing No. 38-3 at 7; *see also* Filing No. 38-8 at 6.]  Additionally, it may be used for "some portions of a large partial loss" like when "portions of the repair are more in line with a new construction scenario."  [Filing No. 38-3 at 7.]  Restoration pricing "is for jobs other than total losses or new construction" and "provides a cost for each line item based on labor productivity that includes such things as drive time, mobilization costs, material delivery, and overall reduction in productivity that occurs when repair professionals address the complex issues found in restoration and remodeling jobs (for example, matching drywall texture or working in an occupied home)."  [Filing No. 38-3 at 7.]  Thus, an estimate using new construction pricing will be lower than an estimate using restoration pricing because new construction pricing uses a higher labor productivity rate. [*See* Filing No. 38-3 at 3.]

## C.  State Farm's Training on the Duty of Good Faith

State Farm trains its employees on the duty of good faith and their "obligation to listen, be fair, be open, and carry out . . . the contract in good faith."  [Filing No. 43-4 at 24; Filing No. 43-4 at 27.]

### D.  The Fire

On September 21, 2020, a fire burned the majority of the Skenders' roof and second floor of their home, which resulted in additional smoke and water damage.  [Filing No. 38-2 at 2.]  The following picture shows the Skenders' house immediately after the fire[2]:



That same day, the Skenders filed a claim under their Policy, [Filing No. 38-3 at 1; Filing No. 43-5 at 1], and State Farm provided the Skenders with a $10,000 advanced payment, [Filing No. 43-2 at 10].

Mr. Szczerbik met with the Skenders the day after the fire to discuss their claim and inspect their home.  [Filing No. 38-3 at 1-2.]  Mr. Szczerbik explained that the Policy provided coverage for additional living expenses while their home was uninhabitable, and the Skenders quickly

---

[2] The Court notes this photograph of the Skenders' home taken immediately after the fire has not been made record evidence.  Nevertheless, the Court provides it solely for the reader's reference. The Skenders use the photograph in their Response in Opposition to Defendants' Motion for Partial Summary Judgment, [Filing No. 44 at 4], and State Farm does not object or otherwise take issue with the photograph, [see generally Filing No. 53].

signed a lease for a rental home.  [Filing No. 38-3 at 2; Filing No. 39 at 3.]  The Skenders also indicated that they would contract Belfor to evaluate the damage and to obtain a quote regarding the scope of the repair.  [Filing No. 38-2 at 3; Filing No. 38-3 at 2.]

### E.  Inspections and Estimates

On October 2, 2020, Belfor inspected the damage to the Skenders' home.  [Filing No. 43-1 at 3.]  On October 12, 2020, Belfor provided an estimate[3] using restoration pricing as opposed to new construction pricing.  [Filing No. 43-1 at 3.]  Mr. Skender informed Mr. Szczerbik of Belfor's estimate and asked when State Farm would review it and determine whether it was appropriate. [Filing No. 38-2 at 3.]

Four months later, on January 21, 2021, State Farm completed its estimate at $349,289.38 using new construction pricing and issued the actual cash value of that amount ($259,741.88) to the Skenders the same day.  [Filing No. 38-4; Filing No. 38-3 at 3; Filing No. 43-2 at 11.]  In February 2021, Mr. Skender spoke on the phone with State Farm "about reconciling its estimate with Belfor's estimate" and asked why State Farm thought new construction pricing was appropriate.  [Filing No. 43-1 at 3.]  According to Mr. Skender, he never received an answer, only "complete silence."  [Filing No. 43-1 at 3.]  In March 2021, Mr. Skender participated in a conference call with State Farm and Belfor, where State Farm again refused to answer any questions about its use of new construction pricing, yet "specifically instructed [the Skenders] and Belfor to retain all parts of the structure that could salvaged."  [Filing No. 43-1 at 3.]  At the end of the conference call, State Farm asked Belfor if it would redo its estimate.  [Filing No. 43-1 at 5.]

---

[3] The parties did not submit evidence as to what Belfor's first estimate was.  However, according to State Farm's internal file notes for the Skenders' claim, the estimate was "approximately $100,000 higher than" State Farm's eventual estimate.  [Filing No. 43-2 at 4.]

According to Mr. Szczerbik, though, after he conveyed State Farm's estimate and was met with disagreement from both the Skenders and Belfor on the use of new construction pricing, he "later explained State Farm's decision to use new construction pricing in subsequent phone calls with the Skenders and Belfor." [Filing No. 38-3 at 4.]  Mr. Szczerbik also testified that "new construction" pricing was used because "the fire caused significant damage to the [home] and it would have to be torn down to the studs" and contractors would not have to work around the Skenders' or their belongings since they were not going to be living there during restoration. [Filing No. 38-3 at 3.]  State Farm maintains that its position was consistent with Xactimate literature, which provides "that new construction pricing is appropriate for a total 'ground-up rebuild'," which it contends was the case here because the home was taken "down to the studs." [Filing No. 53 at 12] (citing Filing No. 38-3 at 7).]

On March 4, 2020, Belfor sent State Farm a revised estimate of $472,000, but noted that it could reduce the total to "about $440,000.00" after offering a 5% discount as "a professional courtesy." [Filing No. 38-5 at 1.]  According to the Skenders, this estimate came in just below the total Policy limit, [Filing No. 43-5 at 1-3; Filing No. 44 at 6], but according to State Farm, the estimate exceeded the Policy limit, [Filing No. 39 at 5 (citing Filing No. 38-1 at 3-4)].  Belfor also expressed that it did not agree to the "new construction" pricing format.  [Filing No. 38-5 at 1.] State Farm rejected the estimate.  [Filing No. 38-2 at 5.]

On March 10, 2021, Belfor sent an email to Mr. Szczerbik stating:

As I know [we have] stated, we cannot and will not do this project under new construction pricing.  I can respect State Farm['s] request/policy, but it simply is not accurate.  Nothing about this job would be new construction.  We aren't building a new development with effectives scales of economies; we don't have blueprints and haven't built this home before; we will be working with existing framing conditions and ever increasing material costs (each month we delay the materials go up a ridiculous amount); our subs don't build this style home thus they will be calculating load efficiency for framing, and hvac plus fall for plumbing; plus

adapting to new code requirements for smokes and writing; and insulation for that matter.  Furthermore, we're not a new home builder, and the original builder is not available or unwilling to rebuild this home. . . . We appreciate you taking the time to reconsider your position.

[Filing No. 43-3 at 1.]

At the end of March 2021, Belfor provided a third estimate, but it came back higher than the second estimate because the price of labor and supplies had increased due to supply chain issues from the Covid-19 pandemic.  [Filing No. 38-2 at 5.]  This estimate was again rejected by State Farm.  [Filing No. 38-2 at 5.]  State Farm never proposed to completely rebuild the Skenders' home nor identified any contractor who was willing to rebuild their home using State Farm's estimate.  [Filing No. 43-1 at 4.]

Belfor provided a fourth estimate on April 14, 2021 totaling $ 475,314.03.  [*See* Filing No. 38-2 at 5-6; Filing No. 38-7 at 2; Filing No. 43-1 at 5.]  On April 19, 2021, State Farm increased its estimate to $396,289.38 (a $47,187.18 increase) "after discussion and review of scope of damage" with Belfor, [Filing No. 43-2 at 4-5], but still insisted on using new construction pricing and salvaging parts of the home, [*see* Filing No. 38-3 at 3; Filing No. 43-1 at 3].  But despite the new estimate, State Farm did not immediately issue a supplement payment toward the new amount.  [Filing No. 43-2 at 4.]  Without issuing the supplemental payment, the Skenders could not pay Belfor to begin the work.  [Filing No. 43-1 at 4; *see* Filing No. 43-2 at 4.]

### F.  The Skenders Sign a Contract with Belfor

Although State Farm had not agreed to the full Belfor estimate, the Skenders signed a contract with Belfor in May 2021 for $475,314.03 so that work could begin on their home because they were worried that they would "be past the 2-year deadline for [the Policy]" if construction did not start soon.  [Filing No. 38-2 at 6; Filing No. 38-3 at 4.]

On June 16, 2021, State Farm finally issued a supplemental payment based on its revised estimate from almost two months earlier.  [Filing No. 43-2 at 4.]  The supplemental payment totaled $135,132.68.  [Filing No. 43-2 at 11.]  The supplemental payment plus the actual cash value of the original estimate totaled $394,874.56.  [*See* Filing No. 43-2 at 11.]  Once the supplemental payment was issued, Belfor notified State Farm that it could start demolition on July 26, 2021.  [Filing No. 43-2 at 4.]

### G.  State Farm Internal File Notes Raise Issues with Its Handling of the Claim

On October 18, 2021, State Farm employee Scott Freeman was reviewing Policy payment requests submitted by Mr. Szczerbik and wrote a note in the Skenders' file stating:

> For the record, I am not sure I completely understand how we find ourselves with a [time to repair] date of 08/24/22 on a loss that happened over a year ago with Coverage A damages that now total $396,000.00.  We paid the [actual cash value] ($259,741.88) in 01/12/21.  It took us almost 4 months to build our estimate totaling $349,289.38.  Once we paid the [actual cash value] we should have established a [time to repair] date of 12 months or 01/31/22.  At 4 [months] the Insured should have already had a contractor lined up.
>
> It is not clear what was communicated to the Insured about the fact we owe [additional living expenses] for the shortest time to complete the repairs.  One (1) year to complete the repairs at that point would have been reasonable.  Instead two (2) months later on 03/08/21[,] we learn that the Insured hired [Belfor] to do the repairs.  We receive an estimate that was approximately $100,000 higher than our estimate.  A month later[,] we made revisions to our estimate increasing it to $396,476.56.  This was a $47,187.18 increase.  On 04/20/21[,] you received authority from SM Fanelli per that estimate.  What is odd is we never issued a supplemental payment towards our estimate revisions until almost 2 months later on 06/16/21.  There is nothing in the file to account for that delay.
>
> Once we issued the supplemental payment[,] the contractor informed us they could start [demolition] on 07/26/21.  Ten (10) months will have expired before [demolition] even started.  The contractor is projecting 12 [months] to complete the repairs from that date.  I guess that is how [we] arrived on the current [time to repair] date of 08/24/22.  In my book[,] a customer should not be out of their home for almost 2 years when the Coverage A damages total approximately $396,000.  In my opinion[,] the Insured should have been back in their home before this Christmas.

[Filing No. 43-2 at 3-4.]

**H.  The Skenders Make Changes As Belfor Is Completing the Rebuild**

In the Spring of 2022, well into the rebuild, the Skenders decided to make some improvements that they would pay for separately, out-of-pocket.  [Filing No. 38-8; Filing No. 38-9 at 2-17; Filing No. 43-1 at 5.]  The discussion over these changes spanned seven weeks—from March 17, 2022 to May 4, 2022.  [*See generally* Filing No. 38-8.]

**I.  The Skenders Submit Their Personal Property Inventory List**

On September 11, 2022, the Skenders submitted their personal property inventory list for their costs incurred due to the loss of their residence.  [Filing No. 38-3 at 4; Filing No. 43-1 at 6.] State Farm paid the full amount in May 2023, approximately eight months after the Skenders' submission.  [Filing No. 38-3 at 4; Filing No. 43-1 at 6.]  Both State Farm and the Skenders acknowledge that there was a two-year window to recover under the Policy.  [Filing No. 38-3 at 4; Filing No. 43-1 at 6.]  Although September 11, 2022 is within two years of the fire (September 21, 2020) and the Skenders submitted both (1) testimony from Mr. Skender that they "confirmed with Mr. Szczerbik several times that [they] had timely submitted [their] inventory list," [Filing No. 43-1 at 6], and (2) evidence that Mr. Szczerbik told the Skenders that their inventory was due by September 21, 2022, [Filing No. 43-2 at 2], State Farm submitted testimony from Mr. Szczerbik that the Skenders' submission on September 11, 2021 was "after the two-year window."  [Filing No. 38-3 at 4.]

**J.  Final Cost of Repairs**

Repairs to the Skenders' home were completed in March 2023.  [Filing No 43-1 at 6.]  The final cost of the repairs to the Skenders' home was $475,314.03—the amount from the contract between Belfor and the Skenders.  [Filing No. 43-1 at 6; Filing No. 38-7.]  To date, State Farm has

paid the Skenders $394,874.56 for the work done to their home, with the last payment being the delayed supplemental payment on June 16, 2021.  [Filing No. 43-1 at 6; Filing No. 43-2 at 10-15.] State Farm was notified about the completion of the work.  [Filing No. 43-1 at 6.]  The Skenders contend that State Farm has not paid the remaining Policy limits and has not offered any explanation for its failure to do so.  [Filing No. 43-1 at 6.]

### K.  This Lawsuit

The Skenders filed this lawsuit in Monroe Circuit Court on September 13, 2022, and State Farm removed the case to this Court.  [Filing No. 1 at 1-2.]  The Skenders assert claims for breach of contract and breach of the duty of good faith and fair dealing.  [Filing No. 1 at 8-11.]  In their Statement of Claims, the Skenders frame their breach of the duty of good faith and fair dealing claim as one for both "the manner in which [State Farm] handled [their] claims for loss and damage . . . and in making their ultimate coverage determinations under the [Policy] that systematically and unfairly denied [them] full payment."  [Filing No. 36 at 3.]  State Farm filed its Motion for Partial Summary Judgment on October 20, 2023, in which it asks the Court for summary judgment on the Skenders' breach of the duty of good faith and fair dealing claim "because the parties simply have a good-faith dispute as to how to calculate the cost it would take to repair [the Skenders'] residence."  [Filing No. 39 at 2.]  The Court now considers the Motion for Partial Summary Judgment.

### IV.
### DISCUSSION

State Farm argues that it did not breach its duty to deal in good faith when it concluded that the estimate should utilize new construction pricing instead of restoration pricing, which resulted in less policy proceeds, because State Farm had a rational basis for its position and that it is supported by literate from Xactimate.  [Filing No. 39 at 11-13.]  State Farm asserts that it

considered "the fact that the [home] was being taken down to the studs and the fact that contractor would not have to work around the family or their personal property." [Filing No. 39 at 13.] State Farm also argues that it did not delay the adjustment of the Skenders' claim, but rather that the Skenders' were responsible for the delay because they kept making additional changes to the scope of work completed by the construction company. [Filing No. 39 at 13-15.] And even if any delay could be attributed to it, State Farm contends that there is no evidence of "conscious wrongdoing or malicious intent necessary for [the Skenders] to succeed on their bad faith claim." [Filing No. 39 at 15.]

In response, the Skenders argue that the crux of their breach of the duty of good faith and fair dealing claim is not solely about the use of one pre-repair pricing estimate verses another because regardless of the estimate, the Policy covers what it actually cost to repair the home. [Filing No. 44 at 20-23; Filing No. 44 at 27-28.] They argue that the Policy had high enough limits to pay for the repairs in full, yet State Farm has only paid $394,874.56 when the undisputed actual cost of repairs totaled $475,314.03—a difference of $80,439.47 that "has been due and payable to [them] since before suit was filed." [Filing No. 44 at 44 at 21.] They assert that State Farm "has put forth no good faith explanation for its unfounded refusal to pay these policy proceeds," despite the Policy's clear language that "when the repair or replacement is actually completely, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property." [Filing No. 44 at 23 (quoting Filing No. 38-1 at 30 (the Loss Settlement section of the Policy)).] The Skenders also argue that State Farm has breached the duty of good faith and fair dealing during litigation because their liability to pay the full cost of actual repairs cannot be disputed in good faith, especially because State Farm has "never once disputed, criticized, or even inspected the finalized repairs" or offered other evidence "to support the

existence of any actual dispute over the amounts paid by [the Skenders] to repair their home." [Filing No. 44 at 25.] They further contend that State Farm's use of the new construction pricing estimate constitutes bad faith, but even it does not, State Farm still acted with bad faith when it "took almost four months" for State Farm to produce and pay an estimate so that the Skenders could pay Belfor construction to begin the work and then another six months to issue a supplemental payment that actually got the contractor started. [Filing No. 44 at 28-30.][4]

In reply, State Farm argues that "when reduced to [its] simplest form," the breach of the duty of good faith and fair dealing claim is really only about which pricing model should have been used in State Farm's estimate. [Filing No. 53 at 7-9.] It reasserts that it identified "a rational, principled basis for its pricing," which defeats the Skenders' breach of the duty of good faith and fair dealing claim based on an "unfounded refusal to pay policy proceeds." [Filing No. 53 at 7 (citation and quotation omitted).] State Farm also argues that the Skenders focus on the Loss Settlement provision of the Policy ignores another provision, the Loss Payment provision, which provides "that payments are also contingent on the parties reaching an agreement on the loss." [Filing No. 53 at 8.] It asserts that the Skenders' have only pointed to facts material to their breach of contract claim (whether State Farm owes more money under the Policy), not their breach of the duty of good faith and fair dealing claim, and that their evidence to contradict State Farm's new construction pricing model is "suspect." [Filing No. 53 at 11-13.] It also argues that there was no unfounded delay in payments and highlights the payments that State Farm made, including $10,000 on the day the claim was filed and other payments a few weeks later to cover living

---

[4] The Skenders also argue that "State Farm waived the replacement condition" of their Policy. [Filing No. 44 at 23.] However, the Skenders did not file a cross-motion for summary judgment and neither party asked for judgment on the contract. Therefore, the Court disregards this argument as beyond the scope of the ruling necessary for the current motion. Any issue regarding the contract and waiver of its provisions is an issue for trial.

expenses.  [Filing No. 53 at 15-16.]  State Farm further asserts that even if the Court views payments as delayed, the Skenders have not presented evidence that it was done with ill will and that any delay after the Skenders filed the lawsuit can only be attributed to the commencement of the litigation.  [Filing No. 53 at 16.]

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state law to the substantive issues in the case." *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938)).  The parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that would be applied by the Indiana Supreme Court." *Lodholtz*, 778 F.3d at 639.  "If the Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's intermediate appellate courts as authoritative, unless there is a compelling reason to think that the state supreme court would decide the issue differently." *Id.*

Indiana law recognizes a cause of action for an insurer's breach of its duty to deal with its insured in good faith. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993).  This duty of good faith includes, but is not limited to, "refrain[ing] from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of [its] claim." *Id.*; *see also Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) ("[A]n insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim").  The duty is not necessarily breached merely because an insurer denies a claim, even if it is later determined that the insurer breached the contract. *Erie Ins. Co.*, 622 N.E.2d at 520.  The duty is also not necessarily breached by a lack of diligent investigation. *Id.*  Rather,

the duty is breached when the insurer "denies liability knowing that there is no rational, principled basis for doing so." *Id.*

A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977 (internal quotations and citation omitted). Intent is a factual issue that can be proved by circumstantial evidence. *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999) ("[A] final determination of the significance of all of the evidence presented by [the insured] is a question for the jury").[5]

Although it is possible for an insurer to erroneously deny or limit a claim without breaching its duty of good faith, the inverse is not true. In other words, in order to prevail on a claim that State Farm breached its duty of good faith and fair dealing by causing an unfounded delay in making payment and refusing to pay Policy proceeds, the Skenders must establish both that State Farm's actions were a breach of the Policy, and that State Farm had the requisite knowledge and intent to act in bad faith. *See Erie Ins. Co.*, 622 N.E.2d at 520; *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977. The question of breach, however, is not before the Court, so the Court focuses on whether

---

[5] State Farm contends that "[b]ad faith is a legal issue that the Court must resolve, not a factual issue on which [an insured's] claim rests." [Filing No. 39 at 9 (quoting *Villas at Winding Ridge v. State Farm Fire & Cas. Ins. Co.*, 2019 WL 1434220, at *13 (S.D. Ind. Mar. 29, 2019)).] But this contention is not fully accurate. Bad faith is only a legal issue insofar as the Court must decide if the insured presents sufficient evidence from which a reasonable jury could find that the insurer acted in bad faith. If the insured presents such evidence, the question of bad faith converts into a factual issue that the jury must decide. *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 868 (7th Cir. 1994) (A claim of bad faith "involves both questions of fact and mixed questions of law and fact and law."); *Gooch*, 712 N.E.2d at 41 (denying summary judgment on bad faith claim when plaintiff presented evidence suggesting that insurer's conduct was "an intentional act designed to coerce" plaintiff into settlement because "a final determination of the significance of all of the evidence presented [by plaintiff] is a question for the jury."); *Monroe Guar. Ins. Co.*, 829 N.E.2d at 976-77 (explaining that for a bad faith claim, the question of "whether [the insurer's] conduct leading up to and including the issuance of the denial letter rose to the level of bad faith . . . . is the jury's call").

the Skenders have presented evidence that could lead a reasonable jury to conclude that State Farm

acted in bad faith.

The Skenders have presented evidence that State Farm acted in bad faith during the

handling of the Skenders' claim, including but not limited to evidence that:

- State Farm took four months to issue an estimate when "[a]t [four] months[,] the Insured should have already had a contractor lined up," [Filing No. 43-2 at 4];

- State Farm did not make a supplemental payment toward its revised estimate to allow construction to start until almost two months after its revised estimate, even though there was "nothing . . . to account for that delay," [Filing No. 43-2 at 4];

- State Farm did not issue payment on the Skenders' contents claim until eight months after their inventory submission, [Filing No. 43-1 at 6];

- State Farm took inconsistent positions as to the Policy's coverage limits, [Filing No. 38-1 at 3; Filing No. 43-5];

- State Farm repeatedly rejected Belfor's estimates as too high, even though State Farm never identified a contractor who was willing to do the work on new construction pricing or within its estimate, [Filing No. 38-2 at 5; Filing No. 43-1 at 4]; and

- State Farm insisted on new construction pricing even though it demanded that portions of the home be salvaged and Belfor explained why new construction pricing was inappropriate, [Filing No. 43-1 at 3; Filing No. 43-3].

Viewing the record in the light most favorable to the Skenders, this is sufficient evidence

for a reasonable jury to conclude that State Farm breached its duty of good faith and fair dealing,

especially when its employees are trained on the duty of good faith.  [*See* Filing No. 43-4 at 24;

Filing No. 43-4 at 27.]  In other words, this evidence is enough to create a genuine issue of material

fact, warranting the denial of summary judgment.  Accordingly, the Court **DENIES** State Farm's

Motion for Partial Summary Judgment, [38].

## V.

### CONCLUSION

For the foregoing reasons, the Court:

- **OVERRULES** State Farm's objection regarding Mr. Jones' deposition testimony from another case**;**

- **OVERRULES AS MOOT** State Farm's objections regarding the Skenders' testimony as to medical and emotional damages and the Skenders' objections to State Farm's new exhibits in response;

- **SUSTAINS** State Farm's objection to Mr. Skenders' testimony regarding the appropriateness of restoration pricing and the difficulties of the repairs; and

- **DENIES** State Farm's Motion for Partial Summary Judgment, [38].

No partial final judgment shall issue.  The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of resolving this matter prior to the upcoming April 22, 2024 trial.


Date: 2/16/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**

22